# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>ERIC YOCKEY,<br><br>    Defendant. | No. CR09-4023-MWB<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

———————————

The defendant Eric Yockey is charged in an indictment with two counts of receipt of child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1), and one count of possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(b) and 2252A1(b)(2). *See* Doc. No. 1. On July 9, 2009, Yockey filed a motion to suppress. Doc. No. 17. In the motion, he alleges his cell phone was unlawfully searched without a warrant, and he argues any evidence found during the search, and any testimony concerning that evidence, should be suppressed. He also alleges that statements he made to the police shortly after the search should be suppressed as the "fruit of the poisonous tree" (citing *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)). The plaintiff (the "Government") resisted the motion on July 20, 2009. Doc. No. 27.

The Trial Management Order assigned motions to suppress to the undersigned to conduct any necessary evidentiary hearing, and to prepare a report on, and recommended disposition of, the motion. *See* Doc. No. 11, § IV.A. Accordingly, the court held a hearing on the motion on July 23, 2009, at which Assistant United States Attorney Mark Tremmel appeared on behalf of the Government, and Yockey appeared with his attorney, Assistant Federal Defender Robert Wichser. The Government offered the testimony of Woodbury County Correctional Officer Charles Collison, Sioux City Police Officer Jason Williams, and Sioux City Police Detective Ryan Bertrand. Yockey offered the testimony

of cell phone repair technician Terry Anderson. Seven exhibits were admitted into evidence, to-wit: Gov't Ex. 1, Woodbury County Sheriff's Office Jail Procedures and Guidelines; Gov't Ex. 2, audio recording of Detective Bertrand's interview of Yockey; Gov't Ex. 3, photograph of Samsung cell phone, front view; Gov't Ex. 4, photograph of Samsung cell phone, right side; Gov't Ex. 5, photograph of Samsung cell phone, left side; Gov't Ex. 6, "Voluntary Witness Statement" of Officer Collison; and Def. Ex. A, photograph of Samsung Model U340 cell phone. The motion is now fully submitted and ripe for review.

The following background facts are relevant to consideration of Yockey's motion. On December 11, 2008, at approximately 7:27 p.m., Sioux City Police Officer Jason Williams stopped a vehicle for an expired registration tag. Williams learned that the driver of the vehicle, Yockey, had a suspended operator's license. He placed Yockey under arrest and took him to the Woodbury County Jail for booking.

At the jail, Yockey was searched by Officer Collison in accordance with the jail's standard booking procedures. As Collison was emptying Yockey's pockets, he discovered a "flip" style cell phone. The phone was closed, but the power was turned on. Standard jail procedures (*see* Gov't Ex. 1) required that the cell phone be turned off,[1] so Collison opened the phone and attempted to turn it off. According to his testimony, he first pressed the "END" button, which ordinarily would have shut the phone off, but that did not work. He next tried to turn the phone off by pressing the right directional arrow, but he accidentally pressed some of the other buttons, which instead of turning the phone off, accessed pictures stored on the phone. A pornographic image of a naked girl who appeared to be seven to ten years old appeared on the screen. Collison took the phone to

---

[1] Collison testified there are two reasons for this requirement. First, the arrestee often needs to use the cell phone to arrange for a ride when he is released, and if the phone is not turned off, the battery will run down. Second, if cell phones are not turned off, they will ring frequently in the booking office, causing a distraction.

Officer Williams, who was still in the booking area completing paperwork from the arrest, told him what he had observed, and gave the phone to him.

Williams looked at twenty to twenty-five pictures stored on the phone, and determined that several contained pornographic images of children. Williams had Yockey sign a "seized property sheet" acknowledging that Williams had seized the cell phone, and asked Yockey if the phone was his. Yockey responded that it was. Williams called his Sergeant, who directed him to contact Detective Bertrand. At about 8:00 p.m., Williams made contact with Bertrand and told him what he had observed, and arranged to deliver the phone to him. Bertrand told Williams not to turn the phone off because he was concerned it might be password protected. Williams met with Bertrand and gave him the phone.

Beginning at 9:08 p.m., Bertrand interviewed Yockey at the Woodbury County Jail. At the outset of the interview, Bertrand introduced himself and advised Yockey of his *Miranda*[2] rights. Yockey acknowledged that he understood his rights, and agreed to talk with Bertrand.[3] Bertrand told Yockey he had not yet examined the cell phone, and asked what he would find on the phone. Yockey responded that he would find about 143 pornographic images. Bertrand asked for permission to examine the phone, and Yockey gave it. Bertrand looked in the "pictures" section of the phone's memory, where he discovered numerous pictures containing pornographic images of children. Yockey then made several incriminating statements.

A search conducted without a warrant is *per se* unreasonable, subject only to a few "specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). One of these exceptions is for

---

[2]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3]On the recording of the interview, Bertrand asks Yockey if he would be willing to answer some questions, and no audible response can be heard, but Bertrand testified that Yockey nodded to give assent, and then proceeded to answer his questions. The court finds this testimony to be credible.

3

items discovered during a search in connection with a property inventory following an arrest. This exception was recognized in *Illinois v. Lafayette*, 462 U.S. 640, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983), in which the court held, "Examining all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure." *Id.*, 462 U.S. at 646, 103 S. Ct. at 2609-10.

To be valid, such searches must be performed "in accordance with established inventory procedures," *id.*, 462 U.S. at 648, 103 S. Ct. at 2611, and the policy or practice governing the search "should be designed to produce an inventory." *Florida v. Wells*, 495 U.S. 1, 4, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990); *see United States v. Rowland*, 341 F.3d 774, 779 (8th Cir. 2003) (the only limit on an inventory search is that it be reasonable under the circumstances, citing *South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976)). Booking searches serves an important function. "A standardized procedure for making a list or inventory as soon as reasonable after reaching the stationhouse not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person." *Illinois v. Lafayette*, 462 U.S. at 646, 103 S. Ct. at 2609. However, an inventory search must not be for an unlawful purpose. For example, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. at 4, 110 S. Ct. at 1635.

There is no dispute that Collison took Yockey's cell phone from him as part of standard booking procedures at the Woodbury County Jail. There also is no dispute that while performing these procedures, Collison did something that caused a pornographic image of a child to be displayed on the phone's screen, and he did so without a warrant to search the phone. The question is whether, under the circumstances of this case, this was an unlawful search.

A search warrant is required to search the contents of a cell phone unless an exception to the warrant requirement exists. *United States v. Flores*, 122 F. Supp. 2d 491, 494-95 (S.D.N.Y. 2000) (search of cell phone's contents not part of proper inventory

search); *see United States v. Zavala*, 541 F.3d 562, 577 (5th Cir. 2008) (possession of cell phone gives rise to reasonable expectation of privacy regarding its contents, citing *United States v. Finley*, 477 F.3d 250, 258-59 (5th Cir. 2007)); *United States v. Quintana*, 594 F. Supp. 2d 1291, 1299 (M.D. Fla. 2009) (an owner of a cell phone has a reasonable expectation of privacy in the electronic data stored on the phone, citing *Quon v. Arch Wireless Operating Co.*, 529 F.3d 892, 905 (9thCir. 2008)). The Government bears the burden of establishing the exception. *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S. Ct. 2022, 2032, 29 L. Ed. 2d 564 (1971); *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576(1967).

The court finds that Collison had the right to turn the cell phone off as part of the jail's standard booking procedures. This was an entirely reasonable and standard administrative practice. Yockey had been arrested for driving with a suspended driver's license and taken to the jail. The jail was justified in removing his personal property from him before he was placed in the jail population. The jail also was justified in conducting an inventory of the property to document what was taken from him. However, the purpose behind these actions was not advanced by "general rummaging" through the cell phone's memory. *See Florida v. Wells*, 495 U.S. at 4, 110 S. Ct. at 1635; *United States v. Park*, 2007 WL 1521573, at *11 (N.D. Cal., May 23, 2007) (no legitimate governmental interests served by searching contents of a cell phone as part of booking process); *United States v. Wall*, 2008 WL 5381412, at *4 (S.D. Fla., Dec.22, 2008) (same). There simply was no need to search the cell phone's memory to accomplish the purposes of the inventory search. Under the circumstances in this case, such a search was not a proper part of the inventorying process.

The Government does not really argue that Collison had the right to search the cell phone's memory as part of the jail's booking procedures. Instead, it argues that Collison did not search the phone at all, but inadvertently caused an image containing child pornography to come into his "plain view" while he was attempting to turn the phone off.

5

The Government claims the "plain view" exception to the warrant requirement justifies the subsequent questioning of Yockey and the eventual searches of the phone.[4]

The "plain view" exception allows the police to seize an item that comes within their plain view during a lawful search. *Coolidge v. New Hampshire*, 403 U.S. at 465-71, 91 S. Ct. at 2037-41; *Texas v. Brown*, 460 U.S. 730, 736-37, 103 S. Ct. 1535, 1540-41, 75 L. Ed. 2d 502 (1983). The exception does not apply if the seized item has to be manipulated by the police before it comes into plain view, unless the manipulation is inadvertent. *See Arizona v. Hicks*, 480 U.S. 321, 324-325, 334, 107 S. Ct. 1149, 1152, 94 L. Ed. 2d 347 (1987)); *but see Horton v. California*, 496 U.S. 128, 137, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990) ("plain view" exception can apply even when discovery of the item is not inadvertent if officer seizing the item does not violate the Fourth Amendment in arriving at the place where the item can be plainly viewed.)

The question here is whether the Collison observed the image of child pornography on the cell phone by accident or on purpose. The plain view exception is not available to an officer who violates the Fourth Amendment in arriving at the place from which the evidence can be plainly viewed. *United States v. Wilson*, 565 F.3d 1059, 1064 (8th Cir. 2009); *see also United States v. Banks*, 514 F.3d 769, 773 (8th Cir. 2008). Collison did not have the right to rummage through the phone's memory looking for evidence of a crime. If he caused the image to appear accidentally, then the plain view exception applies; if he did it on purpose, then the exception does not apply. The issue comes down to his credibility.

Yockey argues Collison intentionally rummaged through the cell phone's memory to find evidence of criminal activity, and his testimony to the contrary is not credible. Yockey points out there is undisputed evidence in the record establishing that the cell

---

[4]Images on the phone were examined by Officer Williams shortly after he took possession of it from Collison. Images on the phone were examined by Detective Bertrand, with Yockey's consent, during the interview on December 11, 2008. The phone was searched later pursuant to state and federal search warrants.

6

phone could have been turned off by simply holding down the "END" button for a few seconds. Collison testified this is what he did, but the phone did not turn off, and when he attempted to turn the phone off using other buttons, he accidentally caused the picture containing child pornography to be displayed. Yockey argues this explanation is unlikely.

The court agrees that Collison's explanation is unlikely. However, after carefully considering the evidence, the court finds this is exactly what happened. Both Detective Bertrand and the defense expert, Terry Anderson, explained how this unlikely series of events could have taken place. The simplest, and most likely, explanation is that Collison inadvertently depressed the "camera" function button on the right side of the cell phone and then the "soft key" on the left side of the face of the phone. According to both of these witnesses, these two mistaken entries would have caused the pornographic image of the child to be displayed. There are several other combinations of mistaken entries that also could have cause the image to displayed, but each required three or more mistaken entries.

The court finds that although Collison's explanation is unlikely, the alternative explanations are even more unlikely. The court can imagine only two reasons for Collison to have rummaged through Yockey's cell phone: (1) he regularly conducts such searches; or (2) he was suspicious of Yockey for some reason and decided to look through the cell phone for evidence to support his suspicions. The evidence does not support either of these hypotheses. Collison has been conducting booking searches at the jail for nine years, and as part of that process, he has turned off hundreds of cell phones. He testified that this is the first time he has discovered evidence of criminal activity from a cell phone during a booking, and there is nothing in the record to dispute this testimony. If Collison routinely had searched cell phones for incriminating evidence while booking inmates, it is highly unlikely that the present case would have been the first time he would have discovered evidence of criminal activity. Similarly, there is no evidence to suggest Collison had any reason to be suspicious of Yockey. In fact, the evidence suggests the

discovery of the images on Yockey's cell phone was a complete surprise both to Yockey and to the other involved law enforcement officers.

The court acknowledges that Collision's explanation seems, on the surface, to be implausible. However, after hearing all the evidence, which included a demonstration of the operations of the cell phone by the defense expert; considering the alternative explanations; and observing Collison's demeanor while testifying, the court finds him to be credible. Accordingly, the court finds that Collison's testimony concerning Yockey's booking, and the image Collison viewed on the cell phone during the booking process, should not be suppressed.

The court next considers whether Officer Williams's testimony about the images he viewed on the cell phone should be suppressed. Williams looked at these images after Collison gave the phone to him at the jail. Williams did not have a warrant or consent from Yockey to look at the images, but he testified that he believed he had the right to do so as part of a search incident to arrest.

In *United States v. Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973), the Supreme Court held that a lawful custodial arrest authorizes a full search of the arrestee's person, and such a search is "not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." 414 U.S. at 235, 94 S. Ct. at 494. Such a search must be contemporaneous with the arrest. *See New York v. Belton*, 453 U.S. 454, 460, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981). To be contemporaneous with an arrest, the search must have been part of a "continuing series of events" flowing from the arrest. *United States v. Hrasky*, 453 F.3d 1099, 1102-03 (8th Cir. 2006).

Here, the cell phone was searched by Williams after the defendant had been arrested, delivered to the custody of the jail, and booked. No reasonable claim can be made that the search was contemporaneous with the arrest. *See Finley*, 477 F.3d at 258-60 (search of cell phone incident to arrest must be substantially contemporaneous with arrest);

8

*Park*, 2007 WL 1521573, at *7-8 (same); *Quintana*, 594 F. Supp. 2d at 1300 (search of contents of cell phone was not a search incident to arrest on charge of driving with a suspended license); *cf. Arizona v. Gant*, ___ U.S. ___, ___, 129 S. Ct 1710, 1720-21 (2009) ("Courts that have read *Belton* expansively are at odds regarding how close in time to the arrest and how proximate to the arrestee's vehicle an officer's first contact with the arrestee must be to bring the encounter within *Belton 's* purview and whether a search is reasonable when it commences or continues after the arrestee has been removed from the scene."); *Knowles v. Iowa*, 525 U.S. 113, 118, 119 S. Ct. 484, 142 L. Ed. 2d 492 (1998) (need to discover and preserve evidence disappeared after citation was issued). Williams's search of the cell phone was not a contemporaneous search incident to Yockey's arrest, and any testimony concerning that search should be suppressed.

Yockey's admission to Williams that the cell phone belonged to him also must be suppressed. Williams asked Yockey if the phone belonged to him while Yockey was in custody and before he was given his *Miranda* rights. No excepton to *Miranda* applies. Therefore, the statement must be suppressed. *See, e.g.*, *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S. Ct. 1285, 1293, 84 L. Ed. 2d 222 (1985) (*Miranda* requires that an unwarned custodial admission be suppressed); *United States v. Vega-Rico*, 417 F.3d 976, 981 n.2 (8th Cir. 2005) ("Unwarned questioning is . . . a violation of the *Miranda* warnings designed to protect Fifth Amendment rights."); *United States v. Carter*, 884 F.2d 368, 372 (8th Cir. 1989) (unwarned custodial statements must be suppressed).

The final issue is whether Detective Bertrand's questioning of Yockey and his search of Yockey's cell phone were tainted by Williams's unlawful search of the cell phone or by his unlawful questioning of Yockey. Because Bertrand advised Yockey of his *Miranda* rights before he questioned him, and he obtained Yockey's consent to search the phone before he looked at its contents, his questioning of Yockey and his search of the

phone are problematic only if they were tainted by Williams's prior illegal search and questioning.[5]

The Government argues that any taint has been attenuated because Yockey's statements to Bertrand and his consent to search the phone occurred after he was advised of his *Miranda* rights. In *Oregon v. Elstad*, 470 U.S. 298, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985), the court explained the interplay between *Miranda* and the Fourth Amendment exclusionary rule:

> It is settled law that "a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'" *Taylor v. Alabama*, 457 U.S. 687, 690, 102 S. Ct. 2664, 2667, 73 L. Ed. 2d 314 (1982) (quoting *Brown v. Illinois*, 422 U.S. 590, 602, 95 S. Ct. 2254, 2261, 45 L. Ed. 2d 416 (1975)).
>
> But as we explained in *[New York v.] Quarles*, [467 U.S. 649, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984),] and *[Michigan v.] Tucker*, [417 U.S. 433, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974)], a procedural *Miranda* violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the "fruits" doctrine. The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits. *Dunaway v. New York*, 442 U.S. 200, 216-217, 99 S. Ct. 2248, 2258-2259, 60 L. Ed. 2d 824 (1979); *Brown v. Illinois*, 422 U.S., at 600-602, 95 S. Ct., at 2260-2261. "The exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. *Id.*, at 601, 95 S. Ct., at 2260. Where a Fourth Amendment violation "taints" the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the

---

[5]The court will address the taint, if any, from the prior actions of Williams and not of Collison because it has held the actions of Collison to be lawful.

10

> confession may be admitted into evidence. *Taylor v. Alabama, supra*, 457 U.S., at 690, 102 S. Ct., at 2667. Beyond this, the prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation.

*Elstad*, 470 U.S. at 206, 105 S. Ct. at 1291.

Thus, as the Court held in *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), all evidence that comes to light due to an illegal search need not be excluded as "fruit of the poisonous tree."

> Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. Maguire, Evidence of Guilt, 221 (1959)." [*Wong Sun*, 371 U.S.] at 487-488, 83 S. Ct., at 417.

*Brown v. Illinois*, 422 U.S. 590, 599, 95 S. Ct. 2254, 2259, 45 L. Ed. 2d 416 (1975). The *Wong Sun* Court observed that excluding statements obtained due to Fourth Amendment violations protects Fourth Amendment rights "in two respects: 'in terms of deterring lawless conduct by federal officers,' and by 'closing the doors of the federal courts to any use of evidence unconstitutionally obtained.'" *Wong Sun*, 371 U.S. at 486, 83 S. Ct. at 416 (citations omitted). Thus, the Court explained, the exclusionary rule "'is calculated to prevent, not to repair. Its purpose is to deter – to compel respect for the constitutional guaranty in the only effectively available way – by removing the incentive to disregard it.'" *Brown*, 422 U.S. at 599-600, 95 S. Ct. at 2260 (quoting *Elkins v. United States*, 364 U.S. 206, 217, 80 S. Ct. 1437, 1444, 4 L. Ed. 2d 1669 (1960)).

The *Brown* Court elaborated on the test to be applied in determining whether a statement that follows an illegal arrest is sufficiently voluntary to cure the primary taint. The Court's discussion is instructive in this case:

> If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of

11

how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. *See Davis v. Mississippi*, 394 U.S. 721, 726-727, 89 S. Ct. 1394, 1397, 22 L. Ed. 2d 676 (1969). Arrests made without warrant or without probable cause, for questioning or 'investigation,' would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expendent [sic] of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.' *See Mapp v. Ohio*, 367 U.S. [643,] 648, 81 S. Ct. [1684,] 1687[, 6 L. Ed. 2d 1081 (1961)].

  It is entirely possible, of course, . . . that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. But the *Miranda* warnings, alone and *per se*, cannot always make the act sufficiently a product of free will [to] break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot assure in every case that the Fourth Amendment violation has not been unduly exploited. *See Westover v. United States*, 384 U.S. 436, 496-497, 86 S. Ct. 1602, 1639, 16 L. Ed. 2d 694 (1966).

  While we therefore reject the *per se* rule . . ., we also decline to adopt any alternative *per se* or 'but for' rule. . . . The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, . . . and, particularly, the purpose and flagrancy of the official misconduct are all relevant. *See Wong Sun v. United States*, 371 U.S., at 491, 83 S. Ct. at 419. The voluntariness of the statement is a threshold requirement.

> *Cf.* 18 U.S.C. § 3501. And the burden of showing admissibility rests, of course, on the prosecution.

*Brown*, 422 U.S. at 602-04, 95 S. Ct. at 2261-62 (footnotes omitted).

The issue in the present case is whether, on one hand, Bertrand exploited Williams's illegal search of Yockey's phone or his illegal questioning of Yockey to the extent that Yockey's statement to Bertrand, and his consent to Bertrand's search of the phone, should be suppressed; or whether, on the other hand, Bertrand would have questioned Yockey and obtained Yockey's consent to search the phone based solely on what Collison saw when he inadvertently accessed the picture on the phone.

Bertrand began his interview of Yockey by advising him of his *Miranda* rights and asking him some background questions. He then asked Yockey to tell him what was on the cell phone. Yockey responded that the phone contained a number of pornographic images.[6] Bertrand then obtained permission from Yockey to look at what was on the phone, and Yockey readily gave it. Bertrand looked at images on the phone with Yockey, and Yockey admitted that the phone contained images depicting child pornography. Yockey then made several additional admissions.

In determining whether the taint from information unlawfully obtained by Williams was attenuated, the court must consider "(1) the giving of *Miranda* warnings, (2) the temporal proximity of the illegal [conduct] and the alleged consent, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct." *United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006) (internal quotation marks and citation omitted). Here, Bertrand did give *Miranda* warnings to Yockey before the interview. Williams's illegal conduct occurred a little more than an hour before Bertrand began interviewing Yockey, so the illegality was close in time to the interview. However, the court finds Bertrand would have interviewed Yockey and asked for permission to search the cell phone even if he had not received any information about Williams's search

---

[6]At this point Yockey did not say anything about child pornography.

13

of the phone and his questioning of Yockey. Collison had learned there was child pornography on Yockey's cell phone before any of Williams's illegal conduct occurred, and this information would have been enough for Bertrand to decide to interview Yockey about the phone and its contents without any further information from Williams. In fact, Bertrand did not appear to use any information from Williams when he interviewed Yockey. Bertrand's involvement in the case was, itself, a circumstance that intervened between Williams's illegal conduct and Bertrand's interview of Yockey and consensual search of the phone. Finally, Williams's conduct was not flagrant. Although his search of the phone was unlawful, he looked at only twenty to twenty-five pictures on the phone before deciding to take further action. Also, his questioning of Yockey consisted of only one question; i.e., whether the phone belonged to Yockey, an issue that is not seriously in dispute.

The court finds the information unlawfully obtained by Williams did not materially contribute to what happened during Bertrand's interview of Yockey, and to the extent it did contribute, any taint from the illegality was adequately attenuated. Williams was involved in this matter only briefly, and was not involved in Bertrand's interview of Yockey. Bertrand did not use Williams's information as a basis for his questioning of Yockey, and in fact, did not even look at the images on the cell phone until after he had *Mirandized* Yockey and obtained Yockey's consent to examine the contents of the phone. There is no evidence to suggest that "but for" the information unlawfully obtained by Williams, the investigation would have proceeded differently. *See United States v. Thomas*, 190 F. Supp. 2d 49, 63 (D. Maine 2002) (applying "but for" test to post-*Miranda* statement). The information provided by Collison was obtained independently and lawfully by Collison before Williams obtained any information, *see United States v. Alvarez-Manzo*, ___ F.3d ___, ___, 2009 WL 1905437, at *6 (8th Cir., July 6, 2009), and Collison's information was adequate, by itself, to explain and justify Bertrand's questioning of Yockey and search of Yockey's phone. *But see United States v. Carney*, 2007 WL

14

1864633, at *16-17 (W.D. Pa., June 27, 2007) (finding taint not attenuated on facts similar to, but distinguishable from, the present case).

The court finds that any taint from Williams's unlawful conduct was sufficiently attenuated by other circumstances, and Yockey's statement to Bertrand, and the contents of the cell phone, should not be suppressed.

Accordingly, the undersigned finds Yockey's statements to Bertrand, and the cell phone and its contents, should not be suppressed, but Yockey's statements to Williams and any testimony by Williams concerning the contents of the cell phone should be suppressed. The undersigned therefore RESPECTFULLY RECOMMENDS that Yockey's motion to suppress be **granted in part and denied in part**, consistent with these finding. Objections to this Report and Recommendation must be filed **by August 10, 2009**. Responses to objections must be filed by **August 14, 2009**.

IMPORTANT NOTE: Any party planning to lodge an objection to this Report and Recommendation must order a transcript of the hearing promptly, but not later than **August 5, 2009, <u>regardless of whether the party believes a transcript is necessary to argue the objection</u>**. If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 3rd day of August, 2009.

*[signature]*

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT